# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| | ) |
| Apartment 618 at 6240 W Sunset Boulevard, Los Angeles, California 90028 ("SUBJECT PREMISES") | ) |

Case No.

2:22-MJ-02682

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349, 1343, 371, 1503(a) | Conspiracy to Commit Wire Fraud; Wire Fraud; Conspiracy to Commit Commodity Fraud; Obstruction of Justice |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

IRS-CI Special Agent Marissa Jerry
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA _____

Hon. John E. McDermott, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: James Hughes

## ATTACHMENT A

PREMISES TO BE SEARCHED

Within Apartment 618 of 6240 W Sunset Boulevard, Los Angeles, CA 90028: (I) the common areas of Apartment 618, and (II) SAFFRON's identified living space, specifically, SAFFRON's bedroom and the connected spaces, including but not limited to the closet with the safe (the "SUBJECT PREMISES").

The SUBJECT PREMISES is an apartment within the Wallace on Sunset apartment complex situated between Sunset Boulevard and Leland Way. The SUBJECT PREMISES is on the south side of the building on the sixth floor, located to the left upon exit of the south elevator.

The door to the apartment has no physical key and instead has a Yale code lock mechanism. There are no windows on the front of the apartment by the door.

Map of Wallace on Sunset Complex with Apartment 618 highlighted
and circled in red



**Front of Wallace on Sunset Apartment Complex**



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1349 (conspiracy to commit wire fraud), § 1343 (wire fraud), § 371 (conspiracy to commit commodity fraud), and § 1503(a) (obstruction of justice) (the "Subject Offenses"), namely:

   a. Application and registration records, documents, programs, applications, or materials relating to the establishment of any financial and/or cryptocurrency related accounts, including, but not limited to, all user profile information and user payment methods such as merchant cards, credit cards, shift card or prepaid card services, merchant card services, and bank account information.

   b. Account identification records, documents, programs, applications, or materials such as name(s) of account holders, email addresses, usernames, mailing or physical addresses, and phone numbers for all account holders or owners and all individuals or entities authorized to access the account as well as, all information related to the funding sources used to establish or fund any account, whether at the time of registration or at any other time.

   c. Correspondence, information, or other records, documents, programs, applications, or materials relating to any communication between SAFFRON and investors, to include (without limitation) notes, letters, email, memoranda, and calendar

1

entries to include, exchange, purchases, or account funding transactions.

   d. Contact information records, documents, programs, applications, or materials for all individuals and entities identified through a "username" or wallet address associated with transactions engaged in during the period above.

   e. Powers of attorney, letters of wishes, corporate minutes, or other legal instruments, records, or documents authorizing any individual or entity to exercise control over an account or any separate account used to remit or receive payments in any currency, virtual or otherwise.

   f. Periodic statements, invoices, records or other documents (or the equivalent) showing dates, amounts, descriptions, bank accounts, and credit card information for all virtual currency transactions.

   g. Financial account history information (on and off-chain) describing the type of transaction (purchase/sale/exchange), statements or other records, documents, programs, applications, materials, the names and wallet addresses of parties involved in a transaction, and the location of the individuals, entities, and merchants involved.

   h. Records, documents, programs, applications, or materials related to creating or reflecting a payment to or from any individual, entity, account, site, or any physical mailing, email, wallet, or website address from an account including, but not limited to checks, wire transfers, electronic transfers, ACH, PayPal, money orders, any transfer of virtual currency

assets including virtual currency wallet addresses, or any other form of payment.

      i.   Records, documents, programs, applications, or materials constituting or reflecting any communication between SAFFRON and any individual, entity, account, site, or address identified including, but not limited to, notes, letters, email, memoranda, calendar entries, and call records regarding virtual currency.

      j.   Records, documents, programs, applications, or materials relating to assets, including but not limited to real or personal.

      k.   Records, documents, programs, applications, or materials showing purchases and sales of cryptocurrency, including on any and all exchanges.

      l.   Records, documents, programs, applications, or materials reflecting the ownership of any businesses owned by SAFFRON.

      m.   Records, documents, programs, applications, or materials reflecting personal living expenditures and liabilities of SAFFRON.

      n.   Records, documents, programs, applications, or materials showing the acquisition, disposition, transfer, gift, or sale of any assets such as real property, vehicles, collectibles, jewelry, paw tickets, or any other personal property, to include contract, receipts, invoices, deeds, deeds of trusts, title records, and loan records comprising evidence

3

of asset acquisition, liabilities, expenditures, and sources of income.

o.    Notes payable and receivable, IOU's, and other recordation of debts.

p.    Any other digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

q.    Information contained in the Telegram App, including the content of communications and identifying information of communications sent and received via those applications.

r.    With respect to any digital devices containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

            iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

            v.  evidence of the times the device was used;

            vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

            vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

            viii.  records of or information about Internet Protocol addresses used by the device;

            ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.  The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of privileged information.

4.    These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") (b) individual(s) not participating in the investigation of the matter, who will be available to assist in the event that a procedure involving potentially privileged information is required (the "Privilege Review Team"); and (c) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section.  SMU attorneys and support staff are not and will not become part of the prosecution team, and have a separate reporting chain from the prosecution team.

5.    The digital device(s) will be transferred to the SMU. Upon receipt of electronic data such as an email account for a filter review, the SMU will review the digital device(s) for potentially privileged information.

6.    The Search Team will, in their discretion, either copy the digital device(s) on-site or seize and copy the digital device(s), and transport the digital device(s) to an appropriate law enforcement laboratory or similar facility to be copied at that location, or provide the material directly to the SMU.

7.    The SMU, in consultation with the Search Team, will compile a list of "privilege search terms" to be used to electronically search the digital devices, including specific names and generic words intended to identify potentially privileged information.  The SMU will conduct an electronic review of the data on the digital device(s) using the privilege

6

search terms, and by using search protocols specifically chosen to identify and segregate documents or data containing potentially privileged information.  All of the data contained in the digital device(s) capable of containing any of the items to be seized may be reviewed using this procedure.  Documents or data that are identified by this review as not potentially privileged, including documents that do not contain the privilege search terms, may be released to the Search Team without court intervention.  Notwithstanding the procedures set forth in this paragraph, where a Search Team member otherwise reviews documents not previously determined to contain potentially privileged information, and later determines that such documents may be potentially privileged, the documents will then be provided to a Privilege Review Team member and handled in accordance with the procedures described in this paragraph.

8.    Documents or data identified during the initial privilege search terms review to be potentially privileged will be segregated.  An SMU attorney may thereafter review the segregated documents to confirm whether or not they contain potentially privileged information.  If the SMU attorney determines the documents or data are not potentially privileged, they may be given to the Search Team.  If at any point the Search Team identified any data or documents that they believe to be potentially privileged, they will cease the review and refer the materials to the SMU for further review by the SMU. If the SMU attorney determines that documents are potentially privileged, the SMU attorney may do any of the following: (a)

apply ex parte to the court for a determination whether or not the documents contain privileged information; (b) defer seeking court intervention and instead segregate the documents in a manner that makes them inaccessible to the Search Team; or (c) disclose the documents to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the documents if the parties cannot reach agreement.

9.    In performing the reviews, both the SMU and the Search Team may search for and attempt to recover:

a.    deleted, "hidden," or encrypted data;

b.    Records and information indicating the identity and location (both past and present) of the person(s) who use or access the Subject Accounts or who exercise in any way any dominion or control over the accounts, including but not limited to associated email accounts and other internet-based accounts, login Internet Protocol ("IP") addresses, and session times and durations

c.    use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

d.    use forensic examination and searching tools, such as Relativity, Cellebrite, EnCase and FTK (Forensic Tool Kit).

10.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return

the digital device and/or delete or destroy all forensic copies thereof.

11.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

12.  If the search determines that a digital device is (a) itself an item to be seized and/or (b) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized absent further court order or written consent of the property owner.

13.  The Search Team shall complete the search as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device and/or forensic image thereof beyond this 180-day period without obtaining an extension of time order from the Court.

14.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the digital device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a digital device because the device or files contained therein is/are encrypted.

15.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

16.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

17.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

10

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

18.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

# **Table of Contents**

I.     INTRODUCTION...........................................1

II.    PURPOSE OF AFFIDAVIT..................................3

III.   SUMMARY OF PROBABLE CAUSE............................4

IV.    STATEMENT OF PROBABLE CAUSE.........................5

V.     LOCATIONS TO BE SEARCHED...........................12

VI.    EVIDENCE TO BE SEIZED..............................17

VII.   ADDITIONAL TRAINING AND EXPERIENCE
       ON DIGITAL DEVICES.................................19

VIII.      CONCLUSION.....................................22

i

## **AFFIDAVIT**

I, Marissa Jerry, being duly sworn, declare and state as follows:

### **I.  INTRODUCTION**

1.  I am a Special Agent with Internal Revenue Service Criminal Investigation ("IRS-CI") and have been so employed since November 2020.  I am currently assigned to the IRS-CI, Los Angeles Field Office, San Diego post of duty.  I am a Federal law enforcement officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure – that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of federal warrants.

2.  As a Special Agent, my responsibilities include the investigation of possible criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and related offenses.

3.  I have a Bachelor of Science in Accounting and a Minor in Criminology from George Mason University.  I am a Certified Public Accountant licensed in the Commonwealth of Virginia.  I completed training at the National Criminal Investigation Training Academy at the Federal Law Enforcement Training Center in Glynco, Georgia.  I completed the eleven (11) week Criminal Investigator Training Program and the sixteen (16) week Special Agent Basic Training Program.  I received extensive training in

1

conducting financial investigations that involve analyzing books and records of individuals and businesses, such as journals, ledgers, bank accounts, invoices, receipts, and other records evidencing violations of the Internal Revenue Code and other financial crimes. I also received extensive training on laws regarding search and seizure and the execution of search warrants. Additionally, I have received training in both cryptocurrency and electronic device search while in Special Agent Basic Training and have since supplemented that training with additional courses offered by Chainalysis and the National White Collar Crime Center.

4. During the course of my employment as a federal law enforcement officer with IRS-CI, I have participated in the execution of three (3) search warrants seeking financial records from residences and businesses. These search warrants also included search and seizure of electronic devices including cellular phones and laptops. As a result of my training and experience, I have become familiar with methods utilized by individuals and companies violating and attempting to violate tax and related financial laws of the United States.

5. Prior to becoming employed by IRS-CI, I worked as a Senior Auditor at an international public accounting firm.

6. The information contained in this Affidavit is based on my personal knowledge and observations made during the course of this investigation, my discussions with other IRS-CI special agents, and my review of records obtained during this investigation, including, but not limited to, federal tax

2

returns and other records maintained by the IRS, records
obtained from banks and other financial institutions, public
records, and information received from other investigative state
and federal agencies.  I have personally participated in the
investigation of the offenses alleged in the Affidavit and am
familiar with the circumstances of the offenses described in
this Affidavit.

## II. PURPOSE OF AFFIDAVIT

7.    I make this affidavit in support of an application
under Rule 41 of the Federal Rules of Criminal Procedure for a
warrant to search the premises known as Apartment 618 at
6240 W Sunset Boulevard, Los Angeles, California 90028
(hereinafter the "SUBJECT PREMISES"), further described in
Attachment A, for the things to be seized described in
Attachment B, which are the evidence, fruits, and
instrumentalities of violations of 18 U.S.C. § 1349 (conspiracy
to commit wire fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C.
§ 371 (conspiracy to commit commodity fraud); and 18 U.S.C.
§ 1503(a) (obstruction of justice)(the "Subject Offenses").

8.    Based on my training and experience, and the
information gathered in this investigation, there is probable
cause to believe that such things described in Attachment B will
be found at the SUBJECT PREMISES.

9.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there

3

is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10. On June 28, 2022, a seven-count Indictment[1] charging defendant David Gilbert Saffron ("SAFFRON") was returned, case number 2:22-cr-00276-DSF, in the U.S. District Court for the Central District of California. SAFFRON is charged with violations of 18 U.S.C. § 1349 (conspiracy to commit wire fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 371 (conspiracy to commit commodity fraud); and 18 U.S.C. § 1503(a) (obstruction of justice) in connection with operating a Ponzi scheme that solicited investments in various cryptocurrencies, which are a form of digital money such as Bitcoin.

11. A warrant was issued on June 28, 2022, commanding that SAFFRON be arrested to answer for the charges in the Indictment. As further described below, IRS-CI agents arrested SAFFRON on

---

[1] On June 30, 2022, the government inquired with the relief courtroom deputy for the Honorable United States District Judge Dale S. Fischer whether Judge Fisher preferred (i) to review a warrant for SAFFRON's cell site and phone location information, or (ii) for the United States Magistrate Judge then currently on duty to review the warrant application. The government was informed that Judge Fisher preferred that the duty Magistrate Judge review the cell site warrant. The government has not contacted Judge Fischer's chambers regarding this warrant.

July 2, 2022, at which time SAFFRON led agents to his current
residence at the SUBJECT PREMISES.

12.    IRS-CI is continuing to investigate SAFFRON, who is
the owner and founder of a collection of entities referred to
herein as "The Investment Schemes" in connection with wire
fraud, commodity fraud, and the obstruction of justice.  The
Investment Schemes collectively include the entities Circle
Society Corp., Bitcoin Wealth Management, Omicron Trust,
Cloud9Capital, and other unnamed entities created by SAFFRON.
SAFFRON used an array of company names for his investment
platform, but each operated in essentially the same manner, as
described below in the statement of probable cause.

13.    In summary of the facts detailed below, there is
probable cause to believe that SAFFRON, the owner and founder of
The Investment Schemes, committed wire fraud and obstructed the
administration of justice in addition to conspiring to commit
wire fraud and commodity fraud from December 2017 to at least
September 2021.  As a result, SAFFRON fraudulently obtained at
least approximately $15,000,000 from investors.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.    As stated in the Indictment, from in or around
December 2017 through at least in or around September 2021,
SAFFRON fraudulently promoted and solicited investments and
obtained at least approximately $15,000,000 in investor funds
for various cryptocurrency trading programs.  SAFFRON falsely
represented to investors that he traded investors' funds to earn
profits, including through investment vehicles such as Circle

Society, Bitcoin Wealth Management, the Omicron Trust, among other entities.

15.  SAFFRON, unindicted co-conspirators ("CC") CC-1, CC-2, CC-3, CC-4, together with others known and unknown, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud members of the public to obtain moneys, funds, assets, and other property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

16.  To lull victims and create the appearance of wealth and success, SAFFRON hosted events for prospective investors at luxury homes in the Hollywood Hills, dinners at high-end restaurants, and traveled with a team of armed security guards.

17.  SAFFRON falsely represented to victim investors that he had personally developed and employed an Artificial Intelligence ("AI") trading robot (an "AI trading bot") that would execute 17,500 transactions per hour on various cryptocurrency exchanges.

18.  SAFFRON falsely represented to investors that the AI trading bot would buy and sell various cryptocurrencies in exchange for one or more fiat currencies as the exchange rates fluctuated up and down.

19.  SAFFRON falsely represented to victim investors that his AI trading bot used "signaling technology" that analyzed news reports, market reports, and "social media sentiment" related to all of the stock exchanges and crypto exchanges around the world.

20.   SAFFRON falsely represented that the AI trading bot would regularly generate between 500% to 600% returns on the amount invested.

21.   SAFFRON falsely represented to victim investors that he "guaranteed" returns of 150% - 300% that would be paid to investors within 30 days after the initial investment, and he would keep any excess profits above that amount for his own compensation.

22.   But SAFFRON did not trade cryptocurrency with victim investors' funds to generate profits.  In fact, SAFFRON was operating an illegal Ponzi scheme to defraud victim investors and to use the funds for his own personal benefit.

23.   SAFFRON made numerous false representations to victim investors to induce them to invest cash or cryptocurrency in SAFFRON's cryptocurrency Ponzi scheme, including that SAFFRON:

a.   Was a computer programmer and the lead developer for the Uber App and Snapchat App;

b.   Wrote the security software used by most U.S. banks;

c.   Developed an AI trading bot that is as advanced as IBM's AI "Watson," which is known for defeating reigning champions on the TV gameshow Jeopardy;

d.   Had perfected the programing of his AI trading bot to execute profitable trades 76 percent of the time; and

e.   Had a series-7 securities broker's license.

24.   Once victims had sent funds or cryptocurrency to SAFFRON, he would falsely represent to victim investors that the

7

investments were growing, and SAFFRON encouraged investors to "roll" or reinvest "profits" earned from SAFFRON's AI trading bot back into SAFFRON's trading programs rather than withdrawing profits.  But, in fact, there were no profits because SAFFRON did not have an AI trading bot, and SAFFRON did not trade the investors' funds to generate profits for the investors. Instead, SAFFRON kept the majority of the funds for his own personal use and benefit.  When the victim investors began to demand the return of their initial investment and the profits that SAFFRON had promised, SAFFRON would make various false representations about the reason he could not repay investors until some later time, including, but not limited to:

       a.   That there was a "solar flare" that required SAFFRON to suspend payments and shutdown his website for a period of days;

       b.   That there were too many unverified transactions on the Bitcoin blockchain that required Saffron to suspend payments to investors;

       c.   That repayments would be suspended for approximately one week because the Bitcoin blockchain limited the number of transactions that SAFFRON's cryptocurrency wallet could have pending at any one time;

       d.   That SAFFRON had not responded to requests from investors because he had suffered a head injury and had to be put into a medically induced coma for five days, when SAFFRON had actually been unable to communicate with victim investors because he was in police custody;

e.    That several of SAFFRON's investors clicked the payout button more than 20 times, thus "locking" SAFFRON's cryptocurrency wallet for 24 to 36 hours; or

f.    That payouts to investors would be suspended for approximately one month while SAFFRON's website underwent "site maintenance."

25.  As another method to avoid victim investors' demands for repayment, SAFFRON would solicit the public to invest in cryptocurrency trading programs managed by an alleged third party that was purportedly "independent" from SAFFRON.

26.  Cloud9Capital was one such (allegedly independent) third-party cryptocurrency investment plan for which SAFFRON solicited investments.  To induce their investment, SAFFRON falsely represented to potential investors that SAFFRON had invested more than 200 of his own Bitcoin in Cloud9Capital. But, in fact, SAFFRON controlled the Cloud9Capital cryptocurrency wallet address, and SAFFRON used Cloud9Capital as part of a scheme to defraud investors and misappropriate investors' funds for SAFFRON's personal benefit.

27.  When the Cloud9Capital site would not honor investors' demands to receive their initial investment and profits back, SAFFRON deflected any responsibility by falsely representing that he too had lost his own investment in Cloud9Capital.

28.  The object of the conspiracies, the commission of wire fraud and commodity fraud, was to be carried out, and was carried out, in substance, as follows:

a.    SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, made materially false statements to victim investors regarding the high-yield returns from investing in SAFFRON's cryptocurrency trading programs;

b.    SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, made materially false statements to victim investors regarding the use of invested funds, falsely representing that funds would be used to trade cryptocurrency and fiat currency to generate profits for investors;

c.    SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, made material omissions to victim investors regarding how investors funds would be used, omitting that funds would be used to personally enrich SAFFRON, CC-1, CC-2, CC-3, and CC-4, and other conspirators;

d.    SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, by and through the conspirators' scheme to defraud victim investors of money and other property, including cryptocurrency, by means of fraudulent pretenses, false representations, and false promises to induce victim investors to transmit, or cause to be transmitted, funds or cryptocurrency by means of interstate wires; and

e.    SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, made materially false statements to victims who had already invested, and who were not repaid as promised, to conceal the scheme from the victims, to conceal the scheme from other potential investors, and to induce victims to invest in the scheme again.

29.  On June 28, 2022, the date that the Indictment was returned and an arrest warrant was issued for SAFFRON, I attempted to contact SAFFRON on his cell phone at (702) 481-1551.  SAFFRON did not answer but sent me a text message asking who was calling.  After identifying myself to SAFFRON and explaining that we were interested in speaking to him, SAFFRON referred me to his lawyer.  I then spoke to his lawyer, Brad Axelrod, who confirmed he would be initially representing SAFFRON, though he would likely not do so in the actual case.

30.  On June 29, 2022, attorney Michael Van contacted me via email and asked that I call him "with regard to the status of the case [against SAFFRON] and to coordinate the surrender." Nevertheless, SAFFRON did not self-surrender or make arrangements with the government to self-surrender prior to his arrest on July 2, 2022.

31.  On June 30, 2022, SAFFRON posted a 42-second voice message to a Telegram chat to wish his followers a happy Fourth of July.

32.  On July 1, 2022, another attorney, Terree Bowers, responded to an email from attorneys for the government, Trial Attorneys Kevin Lowell and Theodore Kneller, regarding SAFFRON's self-surrender.  Mr. Bowers stated that if the government would afford SAFFRON "some patience over the holiday, I [Bowers] am optimistic that on Tuesday [July 5], we can resolve the surrender and release of Mr. Saffron."

//

//

## V.  <u>LOCATION TO BE SEARCHED</u>

**SUBJECT PREMISES – 6240 W Sunset Blvd., Apartment 618,**

**Los Angeles, CA 90028**

33.  As noted above, the Indictment charging SAFFRON was returned and a warrant for SAFFRON's arrest was issued on June 28, 2022.

34.  On June 30, 2022, the government obtained a warrant authorizing the disclosure of historical and prospective cell site and phone location information for SAFFRON's cellular phone to assist IRS-CI agents locate and arrest SAFFRON.

35.  On July 2, 2022, IRS-CI agents had used the real-time cellular phone location data to track SAFFRON to within 25 meters (approximately 82 feet) of longitude and latitude coordinates that were located on or about the 6200 block of Leland Way, Los Angeles, CA 90028.  The cellular carrier disclosed that SAFFRON's phone was pinged within 25 meters of that location at approximately 3:24 a.m. local time.

36.  IRS-CI agents initiated surveillance near the surrounding area of the 25 meter radius of the cell phone location coordinates on the 6200 block of Leland Way.  Two apartment buildings were within the 25-meter radius: apartments at 6250 Leland Way, and the apartments on the South side of the "Wallace on Sunset" apartment complex at 6240 W Sunset Boulevard.

37.  At around 6:00 p.m. on July 2, 2022, the cellular carrier disclosed that SAFFRON's cell phone was still located within 25 meters of the 6200 block of Leland Way, and agents

12

began canvassing the apartment buildings, knocking on doors to ask residents if they had seen SAFFRON.

38.   Agents spoke with and showed SAFFRON's photograph to residents at 6250 Leland Way; none of the residents that agents spoke to recognized SAFFRON.

39.   Agents also canvased the apartments on the South side of the Wallace on Sunset apartment complex that were within the 25-meter radius.

40.   While canvasing the Wallace on Sunset apartments, I spoke to a resident who recognized SAFFRON's photo.  The resident believed that SAFFRON was staying in the Wallace on Sunset apartment complex and that SAFFRON had previously spoken to his wife at the complex's swimming pool.  The resident also recalled that he thought SAFFRON may have been European.  I know that SAFFRON spoke with an Australian accent, which, based on my experience, is sometimes mistaken for a European accent.

41.   The resident who recognized SAFFRON's photo was taking me to speak with his wife to obtain additional information about SAFFRON's whereabouts when I received a call that other IRS-CI agents had found SAFFRON.

42.   Two other IRS-CI agents, who were surveilling the street near the Wallace on Sunset apartment complex, observed SAFFRON walking near the corner of El Centro Boulevard and Sunset Boulevard in Los Angeles, CA, approximately 0.1 miles from the apartment complex.  SAFFRON was walking with his head down and hood up, appearing to attempt to conceal his identity.

43.  Upon seeing SAFFRON, the IRS-CI agents arrested
SAFFRON and asked him if he had any identification.  SAFFRON
stated that he had a passport.  When agents asked SAFFRON for
his passport, SAFFRON told agents he had his passport at his
residence in his safe.  SAFFRON stated that his residence was
"where you guys just were" indicating the Wallace on Sunset
complex.

44.  SAFFRON agreed to hand his passport over to agents.
Guided by SAFFRON, agents escorted SAFFRON from the place of
arrest to the SUBJECT PREMISES – Apartment 618 in the Wallace on
Sunset Apartment Complex at 6240 W Sunset Boulevard.  SAFFRON
had a key fob to get into the building and directed agents to
the "Notes" application in his cellular phone to obtain the
entry code for Apartment 618.

45.  I later determined that agents had knocked on
Apartment 618 when canvasing the apartment complex, but no one
answered the door.  SAFFRON was arrested approximately 0.1 miles
away from the apartment complex approximately 10 minutes after
agents had knocked on Apartment 618.

46.  Once inside Apartment 618, SAFFRON led agents into a
bedroom on the right side of the apartment.  Once inside the
bedroom, SAFFRON directed agents to the first door on the left,
which was a large walk-in closet.  Inside the closet, I noted
signs that SAFFRON lived there, including what appeared to be
his clothes inside the closet.

47.  I recognized one of the shirts as the same shirt
SAFFRON wore in a photograph.  The photograph was taken at a

private jet hanger in Burbank, California on June 20, 2022. The
shirt was a white, long-sleeve, button down shirt with a collar
and has a distinctive black and white print across the middle of
the torso and sleeves that includes the skeleton of a T-Rex
dinosaur on the chest.

48. SAFFRON directed me to the safe behind the closet
door. On top of the safe was an Apple iPad with a black case.
SAFFRON was escorted into the closet where he used his right
hand to unlock the biometric lock. Once the safe was open, I
took out his passport that was sitting on top of what appeared
to be multiple documents and other items within the safe, which
I believe may have included electronic data storage devices.

49. After filling out procedural paperwork and reading
SAFFRON his Miranda rights, SAFFRON asked me to place a ring
that he was wearing on top of the safe. I re-entered SAFFRON's
bedroom and then the closet and placed the ring on top of the
Apple iPad that was sitting on the safe. When I returned, I
told SAFFRON that I placed his ring on top of the iPad, which he
acknowledged was his. Based on my investigation, I have also
learned that SAFFRON owns and personally uses a laptop computer.

50. There is also probable cause to believe that SAFFRON
has been residing at the SUBJECT PREMISES since at least June 2,
2022. I have reviewed historical cell tower site data and phone
location data of SAFFRON's phone for June 2 through June 29,
2022. Based on my review, on multiple dates in June 2022
SAFFRON's cell phone was simultaneously within 100 to 300 meters
of both (1) coordinates identified by the cellular carrier, and

15

(2) the SUBJECT PREMISES.  Furthermore, on the following dates, SAFFRON's cell phone was within 100 to 300 meters of the carrier's coordinates and the SUBJECT PREMISES at times between 9:00 p.m. and 7:00 a.m. (Pacific Daylight Time): June 2 through June 9, June 11, June 14 through June 20, and June 22 through June 29.

51.  There is probable cause to believe that SAFFRON was sending electronic communications while living at the SUBJECT PREMISES that are the evidence, fruits, or instrumentalities of violations of the Subject Offenses.  For example:

a.  On June 6, 2022, SAFFRON's cell phone was located within 100 to 300 meters of the carrier's coordinates and the SUBJECT PREMISES at least five times between 9:00 a.m. and 10:00 p.m.  On that same day, SAFFRON posted to a Telegram chatroom for Circle Society investors and signed his name at the end of the post as "David Saffron, CEO."

b.  On June 27, 2022, I was notified by a Circle Society investor at 6:24 p.m. that SAFFRON had posted to the Telegram chatroom for Circle Society investors earlier that day.  On June 27, 2022, SAFFRON's cell phone was located within 100 to 300 meters of the carrier's coordinates and the SUBJECT PREMISES at least 115 times between 10:40 a.m. and 6:08 p.m.

52.  I observed that SAFFRON appears to live with a roommate, who SAFFRON identified as "Chloe."  This warrant application to search the SUBJECT PREMISES includes only (I) common areas of the SUBJECT PREMISES and (II) SAFFRON's identified living space, specifically, SAFFRON's bedroom and the

16

connected spaces, including but not limited to the closet with the safe.

## VI. **EVIDENCE TO BE SEIZED**

53. Based upon my experience and training, as well as discussions with other law enforcement agents, I know that:

    a.   In the normal operation of a business, records are created.  Even in that of a fraudulent operation, business records are vital for the operations of that business.  Business records are often voluminous and business owners use computers, computer programs, and other electronic devices to create and/or store records.

    b.   Business owners and fraudsters alike often work from their home and will use cellular phones to conduct personal and business transactions, and to communicate with customers or, in this case, victims and co-conspirators.  In addition, with the advent of internet banking and the ability to use the internet for everyday shopping, individuals use electronic devices like iPads to pay utilities, for e-mail, and for other important matters.

    c.   Business and personal financial records are commonly stored both electronically and physically.  Often, physical copies of important financial and personal documents are stored in safes for protection.  Records can also be stored on computer hard drives, computer discs, external computer storage devices, other computer media, and cellular phones. Common storage locations for these items are within residences, business offices, and on one's person.

17

d.    From my training and experience, the above stated facts are particularly true for individuals in the cryptocurrency space.  Digital currency is stored and accessed via electronic devices, especially computers, cellular phones, and tablets.  Additionally, these electronic devices provide a primary pathway for communication to investors and co-conspirators.  Specifically, SAFFRON is very active on chat channels such as "Telegram" as a means of communicating with individuals involved with his various entities.  For instance, on July 1, 2022, SAFFRON posted on Telegram in response to being wanted for arrest, telling users that he is not a criminal and has never committed a crime, among other statements.

e.    Individuals engaged in fraudulent activity may attempt to conceal illicit income and assets by conducting financial transactions in a manner to avoid law enforcement detection.  Persons involved in cryptocurrency crimes often move cryptocurrency through many different wallets, exchanges, banks, and other financial institutions to disguise and conceal their true business and personal affairs.

f.    Based on my training and experience, I know that cryptocurrency addresses, wallets, and keys can be stored physically on paper as well as on devices such as flash drives.  This information is highly protected by cryptocurrency users and as such, is likely to be stored in a secure place, such as in a safe, or hidden away in a residence.  Because cryptocurrency transactions can be traced via a public transaction ledger known as a "blockchain," it is possible to identify the recipient of

18

fraudulent funds based on addresses, wallets, and keys in one's possession.  This adds further incentive to hide or otherwise conceal that information.

54.  Based on all of the above, there is probable cause to believe that the items described in Attachment B will be found at the SUBJECT PREMISES.

## VII.  ADDITIONAL TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

57.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

58.  If identifying and copying data stores onsite is technically or logistically not feasible, the entire server network may be imaged.  As discussed below, whether the image is obtained onsite or offsite will be determined by technical issues, time constraints and safety concerns.  After the images

21

are obtained, the data will be analyzed as provided in Attachment B.

59.   To the extent that there is probable cause to believe that information within the scope of this warrant may be found on additional computers or devices within the parameters of the search, such computers or devices will be forensically imaged onsite or offsite as provided in Attachment B.

60.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

61.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud); § 1349 (conspiracy to commit wire fraud); § 371 (conspiracy to commit commodity fraud); and § 1503(a) (obstruction of justice) will be found at the SUBJECT PREMISES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __ day of July,
2022.

_____
HON. JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE